403 F.2d 12
 Samuel Wayne CATO, a Minor, by his mother and next friend, Mrs. Artmytchel J. Cato; Charles Henry Dove, a Minor, by his father and next friend, William Dove; Brenda Sue Rawlings and Valeria Lou Rawlings, Minors, by their father and next friend, McKinley W. Rawlings; Linda Faye Ware and Jewell Dean Ware, Minors, by their father and next friend, Henry Ware; Avon Neal, a Minor, by his mother and next friend, Mrs. Rosetta Johnson; and Jessie Mae Davis, a Minor, by her mother and next friend, Mrs. Nettie Campbell, Appellants,
v.
Lee PARHAM, Arthur Miller, Orville Phillips, Marvin McDaniel and Victor Brown, Members of the Board of Directors, Dollarway School District No. 2; Charles Fallis, Superintendent of Schools, Dollarway School District No. 2 of Jefferson County, Arkansas; and Dollarway School District No. 2, a Corporation, Appellees.
 No. 19406.
 United States Court of Appeals Eighth Circuit.
 November 8, 1968.
 
 Barbara A. Morris, New York City, for appellants, Robert L. Carter, New York City, and George Howard, Jr., Pine Bluff, Ark., on the brief.
 Robert V. Light, of Smith, Williams, Friday & Bowen, Little Rock, Ark., for appellees, Herschel H. Friday, on the brief.
 Before VOGEL, Senior Circuit Judge, LAY and BRIGHT, Circuit Judges.
 LAY, Circuit Judge.
 
 
 1
 This is an appeal in a school segregation case involving the Dollarway School District in the State of Arkansas. The litigation is the latest in a series of cases extending back to 1959[1] wherein efforts have been made to end the dual system of segregated white and Negro schools and to bring about a unitary, nonracial school system under the mandate of Brown v. Board of Educ. (Brown II), 349 U.S. 294, 75 S.Ct. 753, 491 L.Ed. 1083 (1955). As the record of this appeal demonstrates, these efforts have for the most part been abortive in result.[2]
 
 
 2
 The facts demonstrate that at the present time the Dollarway School District unconstitutionally maintains a biracial school system with only token integration. The Townsend Park schools, with 809 high school students and 894 students in the combined elementary school, is entirely Negro. The Dollarway schools, with 726 high school students and 546 students in the combined elementary grades, is predominantly white. At the commencement of this litigation in September 1967, only 49 Negro students, 20 in the elementary schools and 29 in the high school, were enrolled in the Dollarway schools. Thus approximately three per cent of the total enrollment in the Dollarway schools was Negro. Another elementary school, Pinecrest with 322 students, remains entirely white. These schools serve an area of approximately 25 square miles, and are located about one mile apart.
 
 
 3
 Through the board's use of a so-called "freedom-of-choice" plan, we are informed that during the 1968-69 school term there are 79 Negro students attending the Dollarway schools. This leaves approximately 95 per cent of the Negro students still attending the Townsend Park schools. No white students have exercised their "free choice" to attend the Townsend Park schools. It is quite obvious that under the standards of Green v. County School Bd.,[3] 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), the board's "freedom-of-choice" plan will not achieve the goal of a unitary school system. The July 25, 1968, order of the district court clearly recognizes this fact. The court has ordered the board to come forth with a plan "to disestablish its dual school system and to convert promptly to a unitary system * * *" to be effective by the opening of the 1969-70 session.
 
 
 4
 The posture of the present appeal brought on behalf of the students presents two questions: (1) whether the court's order that the board must adopt a unitary plan[4] by the 1969-70 school term should be advanced to the second semester of the present school year, and (2) whether $700.00 allowance of attorney fees is adequate in view of the work and time spent by plaintiffs' counsel since September 1967 in the existing case.
 
 
 5
 We have reviewed the present record. The district court's memorandum, 293 F. Supp. 1375, demonstrates complete awareness of the board's overall refusal to come forth with a workable plan without "judicial prodding." The district court is fully aware of the pronouncement of the United States Supreme Court and this court relating to the need to achieve a unitary school system at this time.
 
 
 6
 The board in resisting desegregation of faculty in the overall plan urges: (1) that there exists no constitutional mandate to desegregate faculties,[5] and (2) that discriminatory teacher assignment policies are justified on the basis of speech dialect and communication.[6] The board's testimony below presents a belated evidentiary debate challenging the reasonableness of the 1954 equal protection policies of Brown I.[7] Notwithstanding such arguments, the district court has properly delineated the board's obligation to bring forth by December 1 a plan to be effectuated in September 1969 which creates a racially nondiscriminatory school system. The district court has made clear that the time for rhetoric is over. The United States Supreme Court has made clear the time is "now."
 
 
 7
 We agree the board's present freedom-of-choice plan is inadequate in many respects (see Kemp II, Altheimer, supra). However, we see little practical gain in repairing the deficiencies of the present freedom-of-choice plan at this time since it is apparent on its face that it will not work. Nor do we feel there is sufficient time by second semester to restructure the school district without harm to the students by disrupution of classes and teachers. Plaintiffs stated they would not insist on such restructuring if they could be assured that the board would come forth in good faith with a unitary plan of December 1, 1968, to take effect in September 1969. Plaintiffs rest their doubt upon the board's past performance. Counsel for the board has assured this court that the board is studying a geographic zoning plan which will not in any way be "gerrymandered,"[8] and which will create a nonracial school system. We accept that assurance. In the event the board does not bring forth a plan by December 1, 1968, detailing an integrated school system,[9] the district court may exercise its discretion to take evidence if necessary in order to implement a unitary school plan for the 1969-70 school term. However, the latter course of action should not be necessary. The board should now recognize its clear responsibility.
 
 
 8
 It is unfortunate that a more effective plan has not been developed to bring about a transitional change since Brown II. We agree with plaintiffs that further delay even during this school year tends to reward dilatory strategy. However, it likewise places a greater burden on the board to educate the community to a more drastic change. Further delay merely perpetuates that burden and makes more difficult their job ahead. The district court's order of July 25, 1968, lends confidence to this court that "delay" will no longer be equated with "deliberate speed" and that the goal of Brown will be reached commencing in the 1969-70 school term.
 
 
 9
 The trial court awarded plaintiffs $700.00 for attorney fees. Such award is fully within its discretion and will not be disturbed absent a record showing evidential abuse.
 
 
 10
 We affirm the judgment below. Each party is to pay its own costs upon appeal; the case is remanded for continued jurisdiction of the trial court.
 
 
 
 Notes:
 
 
 [1]
 Dove v. Parham, 176 F.Supp. 242 (E.D. Ark.1959); Dove v. Parham, 271 F.2d 132 (8 Cir. 1959); Dove v. Parham, 181 F.Supp. 504 (E.D.Ark.1960); Dove v. Parham, 183 F.Supp. 389 (E.D.Ark. 1960); Dove v. Parham, 282 F.2d 256 (8 Cir. 1960); Dove v. Parham, 5 Race. Rel.R. 989 (1960); Dove v. Parham, 194 F.Supp. 112 (E.D.Ark.1961); Dove v. Parham, 196 F.Supp. 944 (E.D.Ark. 1961); Dove v. Parham, 7 Race.Rel.R. 1047 (1962)
 
 
 [2]
 In Dove v. Parham, 282 F.2d 256 (8 Cir. 1960), this court declared in 1960 that the school district had an obligation "to disestablish a system of imposed segregation." The district court has yet to approve any plan proposed by the board to effectuate even a transitional plan moving toward a nonracial school system
 
 
 [3]
 In Green v. County School Bd., 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), although 115 Negro children were enrolled in the previously all-white school 85 per cent of the Negro children still attended the all-Negro school. In Raney v. Board of Educ., 381 F.2d 252 (8 Cir. 1967), rev'd, 391 U.S. 443, 88 S.Ct. 1697, 20 L.Ed.2d 727 (1968), 85 per cent of the Negro children still attended the all-Negro school. These were both found constitutionally impermissible as operating dual school systems
 
 
 [4]
 The directions by the United States Supreme Court inGreen are applicable to all school systems wherein freedom-of-choice has not worked:
 "Rather than further the dismantling of the dual system, the plan has operated simply to burden children and their parents with a responsibility which Brown II placed squarely on the School Board. The Board must be required to formulate a new plan and, in light of other courses which appear open to the Board, such as zoning, fashion steps which promise realistically to convert promptly to a system without a `white' school and a `Negro' school, but just schools." 391 U.S. 430, 441-442, 88 S.Ct. 1689, 1696.
 See also note 6 discussing plans of desegregation. And see Kemp v. Beasley (Kemp II), 389 F.2d 178, n. 21 (8 Cir. 1968).
 
 
 [5]
 That there exists a constitutional mandate to desegregate teaching staffs is well settled. This court made such duty explicit in Smith v. Board of Educ. of Morrilton School Dist., 365 F.2d 770, 778 (8 Cir., 1966), when we said:
 "It is our firm conclusion that the reach of the Brown decisions, although they specifically concerned only pupil discrimination, clearly extends to the proscription of the employment and assignment of public school teachers on a racial basis. Cf. United Public Workers of America v. Mitchell, 330 U.S. 75, 100, 67 S.Ct. 556, 91 L.Ed. 754 (1947); Wieman v. Updegraff, 344 U.S. 183, 191-192, 73 S.Ct. 215, 97 L.Ed. 216 (1952). See Colorado Anti-Discrimination Comm'n v. Continental Air Lines, Inc., 372 U.S. 714, 721, 83 S.Ct. 1022, 10 L.Ed.2d 84 (1963). This is particularly evident from the Supreme Court's positive indications that nondiscriminatory allocation of faculty is indispensable to the validity of a desegregation plan. Bradley v. School Board, supra, [382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187,]; Rogers v. Paul, supra, [382 U.S. 198, 86 S.Ct. 358, 15 L.Ed.2d 265,]. This court has already said, `Such discrimination [failure to integrate the teaching staff] is proscribed by Brown and also the Civil Rights Act of 1964 and the regulations promulgated thereunder'. Kemp v. Beasley, supra, p. 22 of 352 F.2d [14]."
 See also Kemp v. Beasley, 389 F.2d 178 (8 Cir. 1968); Yarbrough v. Hulbert-West Memphis School Dist., 380 F.2d 962, 987 (8 Cir. 1967); Kelley v. Altheimer, 378 F.2d 483 (8 Cir. 1967).
 
 
 [6]
 The same argument relating to "speech patterns" was rejected in Smith v. Board of Educ. of Morrilton School Dist., supra. Judge Blackmun speaking for this court, said:
 "However, in this day race per se is an impermissible criterion for judging either an applicant's qualifications or the district's needs. And this applies equally to considerations described as environment or ability to communicate or speech patterns or capacity to establish rapport with pupils when these descriptions amount only to euphemistic references to actual or assumed racial distinctions. Obviously underlying the Brown decisions is the principle that such distinctions, if and to the extent they exist, do not justify segregation in educational institutions. Desegregation of pupils inevitably means that some of them will be exposed to teachers of another race. It is now too late for a school board to assume that it may objectively regard all supposed racial differences in order to avoid its obligation to employ teachers in accord with constitutional standards." (Emphasis ours.) 365 F.2d at 782.
 As this court stated in Kemp II:
 "Any teacher qualified to teach white children ought to be competent to teach Negroes and vice-versa. We are concerned with standards of equal education for all students — whether they be white or Negro. The argument for providing superior education for either race alone does not attract or persuade us." 389 F.2d 178, 189.
 
 
 [7]
 In the trial below the board's attorney examines the witnesses: "What irreparable harm is going to come to any Negro school student * * * if he does not have a white teacher?" The clear answer is anticipated; "no harm" — thus, it is urged that the case for continued segregation of faculty is proven. Both the question, as well as the answer, conveniently ignore what "desegregation" is all about. White teachers "harm" neither the white student nor the black — nor can a teacher possibly harm students of either race merely because he is Negro. The evil is the concentrated grouping of teachers by race which brands the school as "white" or "Negro" rather than as a nonracial institution of learning for all. One of the basic reasons freedom-of-choice plans usually fail is because "the predominant race of the students attending a particular school continues to serve as the predicate for the Board assignment of a teacher * * *" and "a predominantly Negro faculty continues to create a pervasive influence on the students' choice of schools. * * *"Kemp II, 389 F.2d at 190. All students have a constitutional right to go to a common school and to be taught by a common faculty of both races.
 
 
 [8]
 On June 26, 1968, counsel indicated to the district court the board was working on attendance maps for formulation of attendance zones. These no doubt will be useful to the court in approving the December 1 plan
 
 
 [9]
 Any effective geographical attendance zoning which creates a unitary and nonracial school system should in itself bring about racial balance of faculty. With substantial racial balance of students in both schools, the continued segregation of teaching staff will have no purpose